

**Dated: March 15, 2019**

**The following is ORDERED:**

Sarah A Hall
United States Bankruptcy Judge

_____

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRANDON BURRIS | ) | Case No. 17-14813-SAH |
| and TISHA BURRIS, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| JASON BURRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. 18-01008-SAH |
| | ) | |
| BRANDON BURRIS, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On November 29, 2018, the Court conducted a trial on the Amended Complaint (the

"Complaint") [Doc. 5] filed on February 26, 2018, by creditor Jason Burris ("J Burris") against

debtor and defendant Brandon Burris ("B Burris"), seeking a determination that his debt is

nondischargeable.  Attorney Jeffrey E. Tate appeared on behalf of J Burris, and attorney

Douglas M. Gierhart appeared on behalf of B Burris. As directed by the Court at the conclusion of trial, the parties filed their written closing arguments on December 17, 2018.

## JURISDICTION

The Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I). Additionally, the parties consented to this Court's entry of final orders pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012.

## BACKGROUND

The parties to this adversary proceeding – B Burris, an attorney, and J Burris, a non-attorney – are brothers involved in contentious and acrimonious probate litigation that began upon their father's death in early 2009. The parties' father and mother had divorced many years earlier, and subsequently, father failed to completely honor his child support obligations to mother, notwithstanding serving a six-month custodial sentence on the divorce court's contempt order.

Upon father's death, the dysfunctional group of eight siblings apparently divided into two opposing factions: "Team Mom," which included B Burris, and "Team Dad," which included J Burris. Generally speaking, Team Mom believed mother was entitled to back child support from father's estate, and Team Dad denied she had a rightful claim thereto. Although mother ultimately obtained a judgment against father's estate in litigation conducted concurrently with the probate litigation, the legal wrangling between the factions completely drained the estate, leaving no assets to satisfy mother's judgment.

2

Much of the expensive legal battle involved challenges to the qualification of the parties' sibling – an older brother – who had been appointed to serve as personal representative of the estate under father's will.  Early on, the designated personal representative took the position that mother's child support claim would be denied.  While J Burris adamantly supported that position, B Burris felt obligated to help his mother obtain what he believed was her due.  In early May 2009, B Burris filed a combined objection to appointment of the designated personal representative and motion to appoint a special administrator.  B Burris first objected to his brother's appointment as personal representative on the basis of conflict of interest, alleging fraudulent transfers of bank accounts into father's and brother's names as joint tenants.  Later, B Burris objected to his brother serving as personal representative on the basis of lack of integrity.  Regardless of the stated bases, B Burris underlying motivation for objecting clearly centered on mother's claim against father's estate for back child support.

In early August 2009, J Burris voluntarily entered the fray by filing a "demurrer" to B Burris' objection to the designated personal representative, claiming that B Burris had failed to state a claim.  After the probate court rejected the conflict of interest objection, B Burris filed an amended objection to the personal representative on the basis of lack of integrity.  Again J Burris voluntarily interposed himself in the probate proceedings, this time by filing a combined "demurrer" and motion to dismiss.  In the midst of the ongoing legal melee, B Burris sought to depose J Burris, who incurred attorney fees in connection therewith.  Both parties were unaccommodating in the process of scheduling the deposition, but B Burris eventually deposed J Burris in April 2010.

3

Like the conflict of interest objection, the probate court ultimately overruled B Burris lack of integrity objection in August 2010.  In doing so, the probate court commented that there was a lack of compromise and communication by everyone involved, and that both the personal representative and B Burris had acted in "bad faith," but subsequently revised its statement to reflect that both had been "equally uncooperative," and should bear their own fees.  However, the probate court permitted J Burris to submit an application for his attorney fees to be paid by B Burris.  As a result, in 2011, J Burris obtained a state court judgment against B Burris for attorney fees and monetary sanctions in the amount of $29,500 for vexatious litigation.  B Burris appealed the judgment, and the appellate court affirmed in 2016.

B Burris and his wife sought chapter 7 bankruptcy protection in 2017, and J Burris filed this adversary proceeding seeking to except the state court attorney fees judgment from discharge pursuant to 11 U.S.C. § 523(a)(6)[1] for willful and malicious injury.  The fact of the debt owed by B Burris to J Burris, in the amount $37,732.01 as of December 8, 2017, was established when both parties filed motions for summary judgment.  But neither party was granted summary judgment in its entirety because the Court concluded there was a genuine issue of fact as to B Burris' intent to cause J Burris injury, a required element of a Section 523(a)(6) claim.  See Summary Judgment Order [Doc. 34] (defined below) entered on November 2, 2018.  In its Summary Judgment Order, the Court instructed the parties to streamline and tailor their presentation of evidence at trial to specifically focus on the required element of B Burris' intent to injure J Burris.

---

[1] Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code, Title 11 of the United States Code.

In making the following Findings of Fact and Conclusions of Law, the Court considered:

a.    The Court's Order (i) Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment with Brief, and with Notice of Opportunity for Hearing [Doc. 21] and (ii) Denying Defendant's Amended Counter-Motion for Summary Judgment with Notice of Opportunity for Hearing [Doc. 33], entered on November 2, 2018 [Doc. 34] (the "Summary Judgment Order");

b.    The Final Pre-Trial Order [Doc. 38] (the "Pretrial Order"), entered on November 20, 2018;

c.    The trial record, including exhibits introduced by J Burris and admitted by the Court,[2] and the testimony of the following witnesses:

    (i)      B Burris;

    (ii)     J Burris;

    (iii)    Tisha Burris, wife of B Burris; and

    (iv)    James W. Dunham, Jr. ("Dunham"), an attorney who represented J Burris in his father's probate proceeding;

d.    Closing Argument of Defendant, Brandon Burris filed by B Burris on December 17, 2018 [Doc. 41] ("B Burris Closing Argument"); and

e.    Plaintiff's Closing Argument filed by J Burris on December 17, 2018 [Doc. 42] ("J Burris Closing Argument").

---

[2]B Burris submitted only one exhibit considered in the Summary Judgment Order and did not seek to introduce any exhibits at trial.  Therefore, all citations to exhibits are to J Burris' exhibits and identified simply as "Exhibit," except for the exhibit described in ¶ 93 as Defendant Exhibit 1.

## FINDINGS OF FACT
### *(from Summary Judgment Order [Doc. 34] and Final Pretrial Order [Doc. 38])*[3]

In the Summary Judgment Order, based on the "paucity" of actual findings and conclusions made by the probate court in the attorney fees judgment or otherwise in the record relating thereto, and the absence of any finding or conclusion regarding B Burris' subjective intent, the Court specifically found that "[a]lthough the propriety of Defendant's conduct in the state court action is more than questionable, evidence exists from which the Court can infer that Defendant's motives were, at least in part, to vindicate and protect his Mother and ensure that her judgment against Decedent's estate was paid." Summary Judgment Order [Doc. 34], p. 27.[4] The facts set forth below were established in the Summary Judgment Order (and expressly adopted by the parties as their stipulated facts in the Pretrial Order).

### Probate Proceeding Background

1.    Ernest James Burris ("Decedent") died in 2009. (Verified Petition, Exhibit 8, ¶ 1)

2.    Dean Burris ("D Burris"), a son, filed a probate action on April 14, 2009, related to Decedent's Will, which appointed him as Executor ("PR"). (Verified Petition, Exhibit 8, ¶ 3, 4)

3.    J Burris, also a son, was an heir under the Will. (Verified Petition, Exhibit 8, ¶ 6)

---

[3]Any references to "Exhibit' is to the Exhibits submitted with the motions for summary judgment.

[4]"In cases where the state court judgment does not contain detailed facts sufficient as findings to meet the federal test of nondischargeability under § 523(a)(2)(A), a bankruptcy court may properly refuse to accord collateral estoppel effect to the state court judgment." Cherry v. Neuschafer (In re Neuschafer), 514 B.R. 719 (10th Cir. BAP 2014) (citing Harold v. Simpson & Co. v. Shuler (In re Shuler), 722 F.2d 1253 (5th Cir. 1984)).

4.    B Burris, also a son and an heir, is a licensed attorney admitted to the Oklahoma Bar on September 27, 2007.  (Verified Petition, Exhibit 8, ¶ 6; OSCN Docket Sheet, Exhibit 9)

5.    B Burris objected to D Burris' appointment as PR contending that he was disqualified by a conflict of interest.  (the "PR Objection," Exhibit 10)

6.    J Burris filed a Demurrer to the PR Objection.  (the "First Demurrer," Exhibit 11)

7.    The probate court rejected the conflict of interest claim at an August 18, 2009, hearing (the "Conflict Hearing").  (Conflict Hearing Transcript, Exhibit 12, p. 98 ll. 15-17)

8.    At the hearing, B Burris changed arguments to claim that D Burris lacked "integrity" to be PR under Okla. Stat. tit. 58, § 102.  (Conflict Hearing Transcript, Exhibit 12, p. 98, ll. 18-23)

9.    B Burris was authorized to file an amended PR Objection to pursue the integrity allegation.  (Conflict Hearing Transcript, Exhibit 12, p. 12 - 13)

10.    At the Conflict Hearing, B Burris requested, and was authorized, to conduct discovery limited to the singular issue of D Burris' integrity.  (Conflict Hearing Transcript, Exhibit 12, p. 16, ll. 8-16; p. 30, ll. 15-19)

11.    B Burris styled his amended objection as a petition, with seven "Causes of Action" (the "Amended PR Objection").   (Exhibit 13)

12.    The Amended PR Objection described, in detail, the family conflict that resulted from Decedent's failed marriage to the parties' mother.  (Amended PR Objection, Exhibit 13)

13.    B Burris' only change relevant to the "integrity" issue in the Amended PR Objection was the vague and unsubstantiated claim that:

37.  Upon information and belief, and per [Decedent] prior to his death, Dean Burris has entered a plea for an offense which could constitute a felony.

(Amended PR Objection, Exhibit 13, p. 7)

14.    A three-day hearing on the Amended PR Objection was held August 18, 19 and 23, 2010

(the "Integrity Hearing").  At its conclusion, the probate court found:

"Be that as it may, the demur is sustained, his [Defendant's] objection will be dismissed on the basis that it completely lacks any foundation as it relates to lack of integrity."

(Integrity Hearing Transcript, Exhibit 14, p. 37, ll. 17-18)

THE COURT: "The Court denies the objection of Brandon Burris. The Court finds Brandon Burris has wholly failed to prove a lack of integrity on behalf of Dean Burris as it relates to the request to prevent Gregory Dean Burris from being the Personal Representative.  It's important that we say only the request of Brandon Burris, in case there is another request.  The Court orders each party to pay their own fees, with the exception that attorney Mr. Dunham can make a request for fees if he desires within 30 days of this date on behalf of his client, Jason Burris from Brandon Burris.  The Court specifically finds that there is bad faith on behalf of both Brandon Burris as well as Gregory Dean Burris. The Court grants both parties an exception to all of the Court's rulings and Order to be submitted by Mr. Poe.  All right, does that reflect the Court's ruling, Mr. Poe?

MR. POE: Your Honor, if I could inquire just because I'm not sure I heard.  Did you say the Order would find that Dean Burris was determined guilty of bad faith?

THE COURT: You know what, I will change that.  The Court finds that both parties were equally uncooperative and as a result of which each party will pay their own fees with the exception of J. Dunham's fees to be paid upon application of Mr. Dunham on behalf of [J Burris] for fees to be paid by [B Burris].

(Integrity Hearing Transcript, Exhibit 14, p. 41, ll. 3-20)

8

## J Burris' Motion for Sanctions

15.  Thereafter, J Burris filed his Motion for Award of Costs and Fees; it was verified by counsel, having first-hand knowledge of the alleged facts.  (the "Sanctions Motion," Exhibit 15)

16.  The Sanctions Motion rested upon the common law ability of a court to award fees "when a litigant has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." (Sanctions Motion, Exhibit 15, p. 3)

17.  The Sanctions Motion highlighted B Burris' general use of unsupported allegations in his *pro se* pleadings to misrepresent his opponents to the court.  For example, B Burris made the following unsubstantiated allegations "upon information and belief" that D Burris had:

    •  committed perjury;

    •  committed assault with a deadly weapon;

    •  committed drug possession and distribution crimes; and

    •  committed murder, or had been complicit in a murder.

(Motion for Continuance Pursuant to, Inter Alia, The Court's October 12, 2009 and November 12, 2009 Orders, Exhibit 16, p. 7, ¶ 6 and p. 9, ¶ 6)

18.  D Burris was then, and is, an assistant U.S. Attorney in the Eastern District of Oklahoma and had passed a federal background check.  (Sanctions Motion, Exhibit 15, p. 2)

**B Burris' Deposition Scheduling Conduct**

19.    The Sanctions Motion focused on several categories of intentional, bad faith behaviors. It first detailed B Burris' bad faith in scheduling J Burris' deposition prior to the Integrity Hearing.  (Sanctions Motion, Exhibit 15, p. 3)

20.    J Burris is an AT&T fiber optic network technician responsible for ensuring the seamless operation of AT&T facilities (e.g. server farms) essential to its global network. (Sanctions Motion, Exhibit 15, p. 5)

21.    J Burris' daily schedule is made known to him only one month out, on a rolling basis. Blocks as long as ten consecutive days "on" are common.  He is generally unable to schedule personal days more than 30 days out.  (Sanctions Motion, Exhibit 15, p. 5, 6)

22.    B Burris was advised about J Burris' job requirements from the outset.  (Sanctions Motion, Exhibit 15, attached Ex. B-1)

23.    But B Burris consistently demanded that J Burris pick dates more than a month out, making him decline and offer dates with which he could comply.  (Sanctions Motion, Exhibit 15, p. 6)

24.    At the Conflict Hearing, the Court ordered all deposition notices be given in 30 days, by September 17, 2009.  (Conflict Hearing Transcript, Exhibit 12, p. 83, l. 7 – p. 85, l. 6)

25.    B Burris' next request for deposition dates was September 14, 2009, four days short of the deadline; it asked for dates "for the first or second week of December and the first or second week of January."  (Sanctions Motion, Exhibit 15, p. 6 and its attached Ex. B-3)

26.    B Burris knew these proposed dates were far outside the 30-day window J Burris needed due to his job.  (Sanctions Motion, Exhibit 15, and its attached Ex. B-1)

27.    Two days later, still within the deadline for notice, J Burris offered two dates within the window, September 25 or 28.  (Sanctions Motion, Exhibit 15, and its attached Ex. B-4)

28.    B Burris rejected those dates, telling J Burris' counsel "for the reasons previously outlined in my email."  (Sanctions Motion, Exhibit 15, p. 6-7)

29.    In a response email, B Burris told counsel that he had noticed the deposition for December 8, 2009.  (Sanctions Motion, Exhibit 15, p. 7, and attached Ex. B-5)

30.    However, no email informing J Burris' counsel that the last week in September was unavailable was ever sent by B Burris, a fact pointed out by J Burris' counsel in an email to B Burris.  (Sanctions Motion, Exhibit 15, p. 7, fn. 2, and its attached Ex. B-6)

31.    The discovery cutoff was extended to December 14, 2009, at B Burris' request.  (Sanctions Motion, Exhibit 15, p. 7; OSCN Docket, Exhibit 18, entry dated 10-12-2009)

32.    Regardless, J Burris still could not commit to the December 8 deposition date because it was outside the 30-day window, a fact B Burris knew when he picked it.  (Sanctions Motion, Exhibit 15, p. 7, and its attached Ex. B-1 and B-7)

33.    J Burris then offered on October 14, 2009, to appear for deposition October 26 or 27.  (Sanctions Motion, Exhibit 15, p. 7, and its attached Ex. B-7)

34.    B Burris rejected the offer without explanation.  (Sanctions Motion, Exhibit 15, p.7, and its attached Ex. B-8)

35.    J Burris responded October 20, removing October 26 (counsel acquired a conflict) and instead offering November 2.  (Sanctions Motion, Exhibit 15, p.7, and its attached Ex. B-9)

36.     B Burris again refused the offered date in an email response consisting almost entirely of

misrepresentations.  (Sanctions Motion, Exhibit 15, p. 7, and its attached Ex. B-10).  The

email's misrepresentations include:

> *"I have properly noticed [J Burris] for deposition pursuant to our agreement..."*
>
> There was no such agreement. [B Burris] merely selected December 8 and sent notice.  (Sanctions Motion, Exhibit 15, p. 7, and its attached Ex. B-5)
>
> *"We have discussed: (a) your representation that [J Burris] has been forbidden from missing work in November, December, and January"*
>
> [J Burris'] counsel never made this representation.  He simply conveyed that [J Burris] could not commit to dates outside a rolling 30 day window. [J Burris] knew of the issue, but repeatedly demanded deposition dates to which he knew [J Burris] could not commit.   (Sanctions Motion, Exhibit 15, p. 7, and its attached Ex. B-1)
>
> *"We have discussed: (b) your prior representation on September 17th that the only day [J Burris] was available this year is September 25th"*
>
> No such representation was made.  (Sanctions Motion, Exhibit 15, p. 7)
>
> *"We have discussed [J Burris] (c) your representation now, on October 20, that the only day [J Burris]is available this year is October 27th"*
>
> No such representation was made.  Counsel's October 20 email to [B Burris] not only reiterated the availability of October 27th, but offered November 2 as an additional potential date.  (Sanctions Motion, Exhibit 15, p. 7, and its attached Ex. B-9)

37.     Regardless, J Burris was prepared to be deposed in Tulsa on December 8, 2009, per

B Burris' "notice."  (Sanctions Motion, Exhibit 15, p. 8)

38.    However, B Burris used an unrelated hearing on November 12, 2009, at which J Burris'

counsel was not present, to extend the discovery deadline to February 12, 2010, and to

obtain an *ex parte* order stating "JASON BURRIS'S DEPOSITION IS TENTATIVELY

SCHEDULED FOR FEB.  , 2010 AT 10:00 A.M., AS A "TARGET DATE."  (Sanctions

Motion, Exhibit 15, p. 8; OSCN Docket, Exhibit 18, minute entry dated 11-12-2009)

39.    B Burris never informed J Burris about cancelling the December 8 deposition or about the

Court-ordered February deposition "target" date.  (Sanctions Motion, Exhibit 15, p. 8)

40.    J Burris' counsel discovered the cancellation just days before the December 8 deposition.

(Sanctions Motion, Exhibit 15, p. 8)

41.    A December 22, 2009, email sent directly to both J Burris and his counsel (which will be

further addressed below) was the first time B Burris even mentioned a February

deposition date.  (Sanctions Motion, Exhibit 15, p. 8, and its attached Ex. B-11)

42.    On March 5, 2010, B Burris filed his Motion for Continuance Pursuant to, Inter Alia, the

Court's October 1, 2009, and November 12, 2009, Orders, wherein he asked that the

March 25, 2010, Integrity Hearing be reset (the "Continuance Motion").  (Exhibit 16)

43.    B Burris used the Continuance Motion to misrepresent J Burris' efforts to schedule his

Deposition and to portray J Burris as uncooperative.  (Sanctions Motion, Exhibit 15, p. 8;

Continuance Motion, Exhibit 16, p. 2-6)

44.    In reality, between August 2009 and April 2010, J Burris offered B Burris six specific

dates and the entire month of March 2010, for J Burris' Deposition in Tulsa.  For

example, between late December 2009, and April 9, 2010:

13

- J Burris asked for February 2010 dates upon which he could appear for deposition. B-12. B Burris offered February 11, 12, 18, or 19. When J Burris selected February 12 (B-14), B Burris replied that such date was "off the table." (Sanctions Motion, Exhibit 15, p. 8, and attached Ex. B-15)

- In response to a Notice of Deposition from B Burris, J Burris went to the Miami airport on February 12, 2010. (Sanctions Motion, Exhibit 15, p. 8, and attached Ex. B-16) - B Burris noticed J Burris for a date he earlier said was "off the table," only to be informed that all regional airports were closed due to a snowstorm. By counsel, J Burris immediately offered to appear the following Monday, February 15. (Sanctions Motion, Exhibit 15, p. 8, and attached Ex. B-17) B Burris declined. (Sanctions Motion, Exhibit 15, p. 8, and attached Ex. B-18)

- J Burris offered, consistently, to be deposed by telephone. (Sanctions Motion, Exhibit 15, p. 8, and attached Ex. B-19)

- Once it was within the 30-day "wheelhouse," J Burris asked B Burris to select any day in March, 2010, to depose him. (Sanctions Motion, Exhibit 15, p. 8, and attached Ex. B-20) B Burris declined to identify any such date. (Sanctions Motion, Exhibit 15, p. 8, and attached Ex. B-21)

45. In the Sanctions Motion, J Burris' counsel attached his timekeeping entries related to B Burris' bad faith in selecting a deposition date and requested sanctions against B Burris for those costs in the sum of $3,983.34. (Sanctions Motion, Exhibit 15, p. 9; and it attached Ex. B-22)

## **B Burris' Deposition Tactics**

46. Instead of conducting a serious and relevant inquiry about D Burris' integrity, B Burris deposed J Burris for over four hours on wholly unrelated topics, such as: to determine which of his siblings might (many years ago) have taken a rifle from J Burris, how J Burris defined "integrity," whether J Burris preferred his father to his mother, and similar, irrelevant issues. (Sanctions Motion, Exhibit 15, p. 9)

47.    A brief sampling of the irrelevant deposition questions include:

"Okay. Well, let me try again. In the past have you ever thought that Dean was either acting clueless or actually was clueless?" (J Burris' Deposition, Exhibit 19, p. 29, l. 8-11)

"Have you ever described our mother as the one who puts her desires to possess newspapers and junk over the well-being of her kids?"  (Sanctions Motion, Exhibit 15, p. 10, and its attached Ex. C-2)

"Have you ever stated, "Mom can let the divorce be over with Dad's death or she can keep the fighting going forever?" (Sanctions Motion, Exhibit 15, p. 10; and its attached Ex. C-3, which is J Burris Transcript, p. 116)

"Have you ever expressed your belief that what was taken from you was not a rifle, but the trust, compassion, and sense of security that you should enjoy within your family, quote/unquote?" (Sanctions Motion, Exhibit 15, p. 10, and its attached Ex. C-4, which is J Burris Transcript, p. 123)

"Have you ever stated, quote/unquote, 'The missing rifle represents another abuse that I have to suffer to be a part of this family?'" (Sanctions Motion, Exhibit 15, p. 10, and its attached Ex. C-5, which is J Burris Transcript, p. 124)

"Have you ever stated, 'Dean now denies knowing that Mom was persecuting Brandon for the stolen gun, but I can recall one occasion when Dean was present when Mom accused Brandon?'" (Sanctions Motion, Exhibit 15, p. 10, and its attached Ex. C-6, which is J Burris Transcript, p. 127)

"Have you ever -- have you -- has it ever been your opinion that there were people that had no obligations to you, yet their food and even love and affection had less conditions than what that woman who claims to be our mother attached to hers?"  (Sanctions Motion, Exhibit 15, p. 10, and its attached Ex. C-7, which is J Burris Transcript, p. 130)

## B Burris' Direct Contact with Represented Parties

48.   After Jay Dunham ("Dunham") appeared in the probate case as J Burris' lawyer, B Burris asked whether he should stop communicating directly with J Burris and communicate only with Dunham.  (Sanctions Motion Exhibit 15, p. 11, and attached Ex. D-1)

49.   Dunham said yes.  (Sanctions Motion, Exhibit 15, p. 11, and attached Ex. D-2)

50.   However, B Burris then intentionally communicated directly to J Burris in violation of his agreement to stop and in violation of Oklahoma Rules of Professional Responsibility 4.2 ("Rule 4.2") in two subsequent "batches."  (Sanctions Motion, Exhibit 15, p. 11-13)

51.   B Burris initiated the first "batch" when he sent a settlement demand to J Burris and other family members.  (Sanctions Motion, Exhibit 15, p. 11, and attached Ex. D-6 and D-7)

52.   At the bottom of the Exhibit D-7, B Burris told represented parties D Burris, J Burris, and Cherie Burns, to ". . . not respond without consulting with your attorney."  (Sanctions Motion, Exhibit 15, attached Ex. D-7)

53.   B Burris managed not to include J Burris in emails the next two weeks; however, on December 22, 2009, he again sent a settlement letter directly to J Burris and his counsel. (Sanctions Motion, Exhibit 15, p. 12, and its attached Ex. D-8 and D-9)

54.   J Burris personally responded, telling B Burris his direct communication violated his ethical duties.  (Sanctions Motion, Exhibit 15, p. 12, and attached Ex. D-10)

55.   B Burris responded back to J Burris:  "Thank you for your unsolicited legal opinion. I extensively reviewed the law regarding my ethical obligations before communicating with you."  (Sanctions Motion, Exhibit 15, p. 12, and attached Ex. D-11)

16

56.   B Burris initiated the second batch of direct communications to J Burris by an email on

      March 11, 2010.  It related to scheduling J Burris' deposition and was critical of J Burris

      and his counsel; B Burris copied the email to other family members and/or their counsel.

      (Sanctions Motion, Exhibit 15, p. 12, and attached Ex. D-12)

57.   J Burris' counsel immediately demanded to know why it was sent directly to J Burris.

      (Sanctions Motion, Exhibit 15, p. 12, and attached Ex. D-13)

58.   This triggered an exchange in which J Burris' counsel presented B Burris 18 cases and

      bar association ethic opinions from 15 jurisdictions – no pertinent Oklahoma authority

      was found – that clearly prohibited B Burris' conduct.  (Sanctions Motion, Exhibit 15,

      p. 12, and attached Ex. D-14)

59.   B Burris' response offered only his own interpretation of Comment 4 to Rule 4.2, and

      then offered to cease direct communications with J Burris only if Dunham agreed to

      follow B Burris' instructions in communicating with his own client.  (Sanctions Motion,

      Exhibit 15, p. 12, and attached Ex. D-15)

60.   That response was also sent to J Burris and triggered J Burris' Motion for Injunctive

      Relief, in which J Burris relied on Rule 4.2 to ask the court to stop B Burris' intentional

      contact.  (Sanctions Motion, Exhibit 15, p. 12, Motion for Injunctive Relief, Exhibit 20)

61.   B Burris then filed his Response To Jason Burris' Motion For Injunctive Relief, again

      citing only his own interpretation of Comment 4 to Rule 4.2 as authority; he cited no

      cases or other legal authority.  (Response to Motion for Injunctive Relief, Exhibit 21)

62.    The court granted J Burris' requested injunction in a Minute Order.  The Minute Order

enjoined B Burris from any further direct communications with J Burris, citing Rule 4.2

as its basis.  (Minute Order, Exhibit 22)

### B Burris' Threat to File a Sanctions Motion

63.    After B Burris filed the Amended PR Objection, J Burris filed a Combined Demurrer and

Motion to Dismiss on September 16, 2009.  (the "Renewed Demurrer," Exhibit 23)

64.    The Renewed Demurrer renewed J Burris' objections related to the repeated portions of

B Burris' original PR Objection.  Given this similarity to the First Demurrer, which had

been overruled, B Burris reasoned that the Renewed Demurrer was in bad faith and

threatened to move for sanctions against J Burris, or his counsel, pursuant to Okla. Stat.

tit. 12, § 2011, if the demurrer was not withdrawn.  (Sanctions Motion, Exhibit 15, p. 13,

and its attached Ex. E-1)

65.    J Burris' counsel entered into a dialogue with B Burris to explain why renewing his

objections in the Renewed Demurrer was not frivolous.  (Sanctions Motion, Exhibit 15,

p. 13, and its attached Ex. E-1 – E-7)

66.    Ultimately, B Burris filed no sanctions motion.  (Sanctions Motion, Exhibit 15, p. 14)

### B Burris' Behavior Violated the OBA's Standards of Professionalism

67.    The Oklahoma Bar Association's Standards of Professionalism ("OBA-SOP") require

that attorneys "not knowingly misstate, distort or improperly exaggerate any fact, opinion

or legal authority."  OBA-SOP 1.2. They further require that lawyers' "conduct with

clients, opposing counsel, parties, witnesses and the public will be honest, professional

and civil."  OBA-SOP 1.6.

18

68.    One email from B Burris to D Burris' attorney speaks volumes of B Burris' goals in this

case:

> . . . your client now faces the prospect of no less than two trials on
> his integrity and at least a year or two of litigation, depending on
> the appeals court, not including the two trials on his conflict of
> interest as to the bank accounts. . . Given this, it would be
> appropriate for your client to submit a reasonable settlement
> offer. . . .

(Sanctions Motion, Exhibit 15, p. 15, and its attached Ex. F-1)

**<u>Procedural History Following the Integrity Hearing</u>**

69.    The original probate judge was recused by the Supreme Court.  (Appeal No. MA109251

Order to Recuse, Exhibit 24)

70.    The case was then assigned to Judge Chappelle, who set all pending motions, including

the Sanctions Motion, for hearing on August 10, 2011 (the "Sanctions Hearing").  (OSCN

Docket, Exhibit 18, entry of 06-16-2011)

71.    B Burris then objected to the Sanctions Motion (the "Sanctions Objection").  (Exhibit 25)

72.    At the Sanctions Hearing, J Burris and B Burris were given a full opportunity to argue

and present evidence related to the Sanctions Motion and Sanctions Objection.  (Appeal

No. 112,918 Answer Brief, Exhibit 26, p. 4, ¶ 2; Sanctions Hearing Transcript, Exhibit

27)

73.    At the Sanctions Hearing, neither J Burris nor B Burris added any argument to their

sanctions pleadings. Thereafter, the Court requested suggested findings and conclusions.

(Appeal No. 112,918 Answer Brief, Exhibit 26, p. 4, ¶ 2; OSCN Docket, Exhibit 18,

entry dated 08-10-2011)

19

74.   J Burris filed his Proposed Findings of Fact and Conclusions of Law on August 22, 2011

(Findings & Conclusions, Exhibit 28), and B Burris filed his on September 6, 2011.

(Response to Findings & Conclusions, Exhibit 29)

75.   On September 16, 2011, the court granted the Sanctions Motion, sanctioning B Burris in

the amount of $29,500.00, out of the of $29,508.34 requested by J Burris in the Sanctions

Motion (the "Sanctions Judgment").  (Exhibit 30)

76.   The Sanctions Judgment found that:

1.   B Burris litigation conduct toward J Burris in this matter has been, inter
     alia, wantonly vexatious and oppressive.

2.   B Burris' litigation conduct toward J Burris in this matter has been, inter
     alia, in substantial bad faith;

3.   B Burris' litigation conduct toward J Burris in this matter has been, inter
     alia, grossly and maliciously unprofessional, unethical, rude, insulting,
     abusive and uncivil;

4.   B Burris' substantive legal position(s) in this matter has/have been at all
     relevant times utterly frivolous and without any factual basis whatsoever;

5.   As a consequence of the foregoing, J Burris should be compensated, and
     B Burris should be sanctioned, by monetary sanctions in the amount of
     $29,500.00.

(Sanctions Judgment, Exhibit 30)

77.   B Burris then retained counsel for the first time, who filed a "Motion for New Trial or to

Reconsider."  (the "1st Motion to Reconsider," Exhibit 31)

78.   Thereafter, J Burris filed a response (Response, Exhibit 32), to which B Burris filed a

reply.  (Reply, Exhibit 33)

79.   The 1st Motion to Reconsider was denied.  (Order, Exhibit 34)

80.    B Burris filed an untimely appeal of that denial, which was dismissed for that reason. (Appeal No. 110,287 Order, Exhibit 35)

81.    B Burris filed a second *pro se* "Motion to Reconsider Interlocutory Sanctions Judgment" pro se March 11, 2014.  (the "2nd Motion to Reconsider," Exhibit 36)

82.    J Burris responded to the 2nd Motion to Reconsider. (Response, Exhibit 37)

83.    The 2nd Motion to Reconsider was denied.  (Order, Exhibit 38)

84.    B Burris filed a third Motion For New Trial And Alternative Motions To Vacate And Reconsider.  (the "3rd Motion to Reconsider," Exhibit 39)

85.    The 3rd Motion to Reconsider was denied.  (Order, Exhibit 40)

86.    B Burris appealed both the fact, and amount, of sanctions (the "Sanctions Appeal"):

> F. The Court Erred in Awarding Sanctions Against [B Burris] in Favor of J Burris in the Amount of $29,500, and the Amount of the Sanctions is Unreasonable and Excessive.

(Sanctions Appeal Brief in Chief, Exhibit 41, p. 27)

87.    J Burris timely filed his Answer Brief.  (Sanctions Appeal Answer Brief, Exhibit 42)

88.    In affirming the Sanctions Judgment, the Court of Civil Appeals stated:

> [W]e agree with the trial court's award in this case. The order making the award made a specific finding as to the bad faith nature of [B Burris'] litigation in this probate, and our review of the record supports this conclusion. While the amount of the estate is small, [B Burris] burdened it with much unneeded animosity and made serious allegations against his siblings, their counsel, and the Special Administrator which had no basis in fact, law, or reality.

(Sanctions Opinion, Exhibit 43, p. 12-13)

89.    Ultimately, the trial court entered a Journal Entry of Judgment awarding J Burris appellate fees of $15,960.00 (the "Appellate Fee Judgment").  (Exhibit 44)

21

90.    B Burris later filed the Second/Renewed Motion to Determine Outstanding Judgment, to

determine the amounts owed to J Burris (the "Motion to Determine").  ( Exhibit 45)

91.    On November 14, 2017, the court found that the outstanding balances would be, as of

December 8, 2017, $22,373.13 on the Sanctions Judgment and $15,358.88 on the

Appellate Fee Judgment (the "Judgment Amount Order").  (Exhibit 46)

92.    Then, on December 7, 2017, J Burris filed a motion seeking an additional $15,259.09 in

fees against B Burris incurred in collection efforts (the "Fee Motion").  (Exhibit 47)

## **Mother's Judgment**

93.    Cherie Burns, the mother of J Burris and B Burris ("Mother"), obtained a judgment

against Decedent's estate in the amount of $150,464.61.  (Defendant Exhibit 1)

94.    Decedent's estate was insufficient to satisfy the claims of Mother.  (Order/Final Decree,

Exhibit 38)

## **ADDITIONAL FINDINGS OF FACT**
*(from Trial Testimony and Exhibits)*

The following facts are derived solely from the presentation of the evidence during the

trial and this Court's observation and critical evaluation of the witnesses' demeanor and

credibility (including that of both J Burris and B Burris).

95.    B Burris was an honor student at the University of Tulsa College of Law where he

participated in law journal and mock trial competition activities, as well as held student

leadership positions.  He was admitted to practice in Oklahoma in 2007, and by all

appearances, was a competent practicing attorney for a number of years thereafter, first

with a Tulsa civil litigation and insurance defense law firm, and then as an attorney for

22

the City of Tulsa.  B Burris is currently employed as Professor and Director of Legal

Assistant Studies Program at Rose State College in Oklahoma City.  (B Burris testimony;

Employee Income Records (Bankr. Doc. 7))

96.    J Burris, who is five years older than B Burris, left Oklahoma upon high school

graduation to enlist in the Army.  After five years of military service, he settled in south

Florida and continues to reside there.  He works as a fiber-optic network technician for

AT&T.   (J Burris testimony; Exhibit 6)

97.    During trial testimony, B Burris referred to his childhood as violent and traumatic, and

J Burris similarly remarked there had been childhood abuses, but no further details were

divulged.  B Burris testified that, prior to Decedent's death, he and J Burris were working

through the trauma and violence together.  Regardless, for decades the Burris family has

been, and remains, highly dysfunctional, and the probate proceedings were illustrative of

that dysfunction.  (B Burris and J Burris testimony)

98.    B Burris testified that upon Decedent's death, his siblings divided into two separate

camps:  "Team Mom" and "Team Dad."  Team Mom, which included B Burris, thought

Mother should be paid back child support from Decedent's estate.  Team Dad, which

included D Burris and J Burris, was determined that any such claim be denied.  (B Burris

testimony)

99.    B Burris testified that he did not have any prior probate legal experience, but took over

representation of Mother as a creditor of Decedent's estate because the fees billed by her

previous attorney had become too expensive.  He also testified that those of his siblings

on "Team Mom" relied on him to take the lead in the probate litigation.  According to

B Burris, because he is an attorney, he also felt some obligation to represent Mother and litigate on behalf of his siblings without charge because Decedent had expressed his desire that his children not hire attorneys and exhaust his estate with attorney fees as had been the case with his own father's estate.  (B Burris testimony)

100.    B Burris believed that, if D Burris was allowed to serve as personal representative of Decedent's estate, he would not pay Mother's claim for child support.  As a result, he filed objections in the probate litigation.  According to B Burris, J Burris agreed with him that D Burris lacked integrity to serve as personal representative and further agreed that D Burris was "unnecessarily and, by implication, intentionally, creating conflict in a number of ways."  (Exhibit 6, D-9)  Thus, B Burris sought to depose J Burris in connection with his objections to D Burris serving as personal representative and the responses that J Burris had filed in reply.

101.    It took months of acerbic communication between B Burris and J Burris and his counsel to schedule the deposition.  Part of the difficulty was J Burris' work schedule.  As a fiber-optic network technician for AT&T, his position is "mission critical," and therefore, his work schedule is unusual and "tight and rigid."  Generally speaking, J Burris works ten days in a row followed by three days off.  Although his work schedules are prepared for a period of only two weeks to a month's time, he does not always have much advance notice of the schedules.  Additionally, his vacation days must be chosen well in advance for the coming calendar-year period and only in one or two week blocks, but personal days off cannot be scheduled in the distant future.  (J Burris testimony; Dunham testimony)  For example, during the probate litigation, J Burris represented that he was

24

"unable to schedule unpaid personal days more than 30 days out, give or take a few days,"
which J Burris alleges B Burris understood, but did not respect in trying to schedule
J Burris deposition, causing rancor between the parties.  (J Burris testimony; Exhibit 6)
Further, in October 2009, counsel for J Burris informed B Burris that J Burris was
"adamant that his employer will not permit him any days off November, December or
even January.  He simply has no choice in the matter."  (Exhibit 6, Attachment B-7)
According to J Burris, however, he "made good faith efforts to appear for deposition in
Oklahoma." (J Burris testimony)

102.  Even after reviewing the voluminous detail contained in the exhibits of the back and forth
between the parties in scheduling the deposition, and hearing testimony at trial about
J Burris' work schedule, the Court lacks clarity concerning how the schedule actually
operated, or the true extent of the difficulty J Burris had in getting time off from work to
be available for his deposition.  In contrast, the Court would note that, at the May 7, 2018,
scheduling conference, the Court proposed November 29, 2018, as the trial date, a date
more than six months in the future.  The Court recalls no scheduling concerns being
voiced by J Burris' counsel or comments that he would have to check and make sure the
date would work for J Burris, and the trial in fact took place on November 29, 2018.[5]
Additionally, given J Burris' testimony that he generally works ten days on followed by
three days off, the Court finds it inconsistent that he would have absolutely no days off

---

[5]In fact, J Burris testified that court attendance was not treated as an emergency and that
there was no court leave.  This would put his attendance at trial in the same category of
scheduling issues as attendance at his deposition.  However, J Burris gave no indication
whatsoever that he had difficulty scheduling time away from work for the trial.

for the three month period of November 2009 to January 2010, as his counsel represented to B Burris.  In light of the foregoing, the Court concludes that, although B Burris unnecessarily and unreasonably complicated scheduling of the deposition, it does not accept J Burris' allegation in his Sanctions Motion that the lack of agreement was "attributable solely to [B Burris'] uncooperativeness – as well as his hidden agenda of creating a record upon which he could be critical of [J Burris], even falsely."  (Exhibit 6)

103.    The deposition of J Burris finally took place on April 9, 2010.  B Burris paid for J Burris' airfare from Florida to Oklahoma as directed by the probate court.  In addition to the deposition being unnecessarily lengthy, B Burris' behavior was antagonistic and combative.  Further, he asked mostly questions that had little to do with the integrity of D Burris to serve as personal representative of Decedent's estate and instead related to family events and childhood abuses occurring many years ago.  (Dunham testimony; J Burris testimony; Exhibit 8)

104.    Jay Dunham, who represented J Burris in the probate litigation, testified that B Burris was extremely difficult to deal with, describing phone conversations as vitriolic and the whole experience as completely miserable, with every little thing being a battle.  He also testified that B Burris acted unethically by directly contacting J Burris even after being advised not to, which necessitated obtaining an order for injunctive relief from the probate court, that in turn generated additional attorney fees.  Further, Dunham testified that B Burris made unreasonable requests and demands regarding copying B Burris on communication with his client J Burris, and that many of B Burris' actions were unrelated to Mother's child support claim.  Dunham's conclusion was that B Burris "picked fights

over everything . . . to gum up the works . . . to occupy my time on behalf of my client,"

knowing that he was running up my client's bill.  (Dunham testimony; Exhibits 9 and 10)

105.    However, Dunham also admitted that parties other than B Burris filed pleadings that ran

up the costs of the probate and related litigation.  (Dunham testimony)  The Court

concludes that one of the parties whose actions contributed to the high costs of litigation

was Dunham's own client, J Burris.  J Burris filed "demurrers" to both of B Burris'

objections to D Burris serving as personal representative.  Additionally, in early April

2010, after Mother's child support claim was deemed rejected by the special

administrator of Decedent's estate, Mother filed an independent suit on her rejected

creditor's claim in Tulsa County state court against the special administrator.  Both

J Burris and D Burris intervened in that suit. (OSCN Docket Sheet, Tulsa County

CJ-2010-2180)  The state court awarded judgment in Mother's favor in the amount of

$150,464.61 for back child support.  (See ¶ 93 above)  Then in December 2011, J Burris

appealed Mother's state court's judgment to the Oklahoma Supreme Court.  However, in

May 2012, he voluntarily dismissed the appeal.  (OSCN Docket Sheet DF-110218)

106.    In requesting attorneys fees from the probate court, J Burris' Sanctions Motion described

B Burris' actions and behaviors in the probate litigation as "unnecessarily inflammatory,

melodramatic, hostile and arrogant," and also as "rude, insulting, disrespectful, [and]

uncivil."  J Burris stated that B Burris' goal was "to impose upon [D] Burris (and all other

family members that support(ed) his appoint[ment] as personal representative) expensive

and burdensome litigation so that they would accede to [B Burris'] demands and his

preferred resolution of the conflict that had plagued this family for more than 20 years."

In fact, B Burris vowed that "come hell or high water, I will see justice done in this family." (Exhibit 6)

107.    B Burris testified that he never threatened or harassed J Burris, nor did he intend to injure J Burris. Further, he testified that his intention behind all of the probate litigation was only to help his Mother obtain back child support from Decedent's estate and resolve the dispute that had afflicted his family for many years. (B Burris testimony) Such is the only direct evidence of B Burris' subjective intent, and the Court found B Burris to be credible on this issue.

108.    J Burris testified that B Burris' behavior towards him was not professional, but purely personal. His complaint is that B Burris advised him to hire an attorney and "immediately started running up fees." (J Burris testimony) However, the Court finds it important that J Burris **did not testify** that the purpose of any of B Burris' litigation tactics (and resulting attorney fees) was specifically to injure him, as opposed to achieving B Burris' desired result in the probate, i.e., that D Burris not serve as personal representative so that Decedent's estate would pay Mother's child support claim, or that "justice be done in the family."

109.    Tisha Burris, B Burris' wife of 19 years, testified that before Decedent's death, J Burris and B Burris managed to get along, and J Burris would visit them around the holidays. However, she testified that as soon as J Burris learned B Burris was going to help Mother with her child support claim against Decedent's estate, their relationship changed drastically. Tisha Burris also testified that, given the family dynamics, when she learned B Burris intended to help Mother, she specifically asked him "are you sure you want to

start this?" He responded "I have to, or I will always regret it." Further, she testified that

during the entirety of the probate proceedings, B Burris never had any vendetta against

J Burris, nor ever expressed wanting to make his brothers pay for what they were doing.

(Tisha Burris testimony)

110.    The Court found all of the witnesses to be generally credible, but the demeanor and

deportment of each witness was completely different. Given the history behind the case,

the Court anticipated that the parties would be angry and hostile. Instead, B Burris

appeared to be nervous and anxious, somewhat cowered, and unable to make eye contact

with opposing counsel, or even his own counsel, while he answered questions on the

witness stand. Additionally, the Court found B Burris to be emotionally fragile, as he

suffered numerous – and sometimes inexplicable – tearful breakdowns during his

testimony. He also appeared to be able to interpret and respond to questions only in a

very precise and literal way, at times frustrating opposing counsel, but he did not appear

to be intentionally evasive while doing so. J Burris, on the other hand, was far more

confident than his brother, but took no responsibility for any part in the almost ten-year

long legal battle between the parties and the on-going incurrence of legal fees. At one

point, he seemed to forget that it was he who filed the adversary proceeding, and when

reminded, still shifted the blame to B Burris, stating "there was no need for [B Burris] to

file bankruptcy." Jay Dunham was, at times, rather indignant during his questioning. He

appeared to be still exasperated and irritated by his experiences with B Burris in the

probate and related litigation. Tisha Burris was also emotional on the witness stand, but

appropriately so given the circumstances, and able to effectively communicate her

observations of B Burris' attitude and behavior towards J Burris.

## CONCLUSIONS OF LAW

"[A] central purpose of the [Bankruptcy] Code is to provide a procedure by which certain

insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new

opportunity in life with a clear field for future effort, unhampered by the pressure and

discouragement of preexisting debt.'" Grogan v. Garner, 498 U.S. 279, 286 (1991) (quoting

Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)).  But, a completely fresh start is limited to

the 'honest but unfortunate debtor.'"  Grogan, 498 U.S. at 286-87 (1991) (citing Local Loan Co.,

292 U.S. at 244).

The Bankruptcy Code's nondischargeability provisions reflect Congress' decision to

exclude certain categories of debts from discharge.  Grogan, 498 U.S. at 287.  Many of the

provisions in Section 523(a) aim to prevent discharge of debts involving a debtor's unacceptable

conduct, such as dishonesty, fraud, or intentional injury.  Even so, exceptions to discharge must

be narrowly construed with doubt being resolved in the debtor's favor.  Bellco First Federal

Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361 (10th Cir. 1997).  Moreover, it is the

***creditor*** seeking to except a debt from discharge that ***has the burden of proving each element*** of

its claim by a preponderance of the evidence.  Grogan, 498 U.S. at 286.

As discussed below, J Burris fell short of that burden. Therefore, the Court concludes the

Sanctions Judgment is dischargeable.

I.       **SECTION 523(a)(6) EXCEPTS FROM DISCHARGE DEBTS RESULTING FROM WILLFUL AND MALICIOUS INJURY BY A DEBTOR.**

Section 523(a)(6) generally relates to torts as opposed to contracts or breaches of duty. Lockerby v. Sierra, 535 F.3d 1038, 1040-41 (9th Cir. 2008).  Section 523(a)(6) excepts from discharge a debt "for **willful** and **malicious** injury by the debtor to another entity or to the property of another entity."  An injury, though not defined in the Bankruptcy Code, is "understood to mean 'a violation of another's legal right, for which the law provides a remedy.'" First Weber Group, Inc. v. Horsfall (In re Horsfall), 736 F.3d 767, 774 (7th Cir. 2013) (quoting In re Lymberpoulos, 453 B.R. 340, 343 (Bankr. N.D. Ill. 2011)).  In other words, mere harm to a person is not enough – "[t]he injury element means a legal injury, a violation of the creditor's legal right."  Steier v. Best, (In re Best), 109 F. App'x 1, 5 (6th Cir. 2004).

To prevail under Section 523(a)(6), a creditor must prove both a **willful act** and a **malicious injury**.  Panalis v. Moore (In re Moore), 357 F.3d 1125, 1129 (10th Cir. 2004).[6]  Thus, an intentional tort is required, and debts resulting from recklessness or negligence are not within the scope of Section 523(a)(6).  Barenberg v. Burton (In re Burton), 2010 WL 3422584, at *6 (citing Kawaauhau v. Geiger, 523 U.S. 57, 64 (1998)).  But, not every intentional tort gives rise to a nondischargeable debt.  Horsfall, 738 F.3d at 775.

The standard for a successful claim under Section 523(a)(6) is a stringent one and requires that the debtor's objectionable conduct must have caused "willful and malicious injury," i.e. "that the actor intend the *consequences* of an act, not simply the act itself."  Berrien v. Van

---

[6]Without proof that the act and the injury were both willful and malicious, an objection to discharge under Section 523(a)(6) fails.  Cocoma v. Nigam (In re Nigam), 2018 WL 3768990 (10th Cir. BAP 2018).

Vuuren, 280 F. App'x 762, 766 (10th Cir. 2008) (citing Kawaauhau, 523 U.S. at 61-62)).

Because "the debtor must desire to cause the consequences of his act or believe that the

consequences are substantially certain to result from it," Berrien, 280 F. App'x at 766 (citing

Moore, 357 F.3d at 1129), a creditor must establish facts that support a reasonable inference that

a debtor deliberately or intentionally caused injury to the creditor.  Barenberg, 2010 WL

3422584, at *6 (citing Kawaauhau, 523 U.S. at 61).

    The Tenth Circuit applies a subjective standard in determining whether a debtor desired

to cause injury or believed the injury was substantially certain to occur.  Utah Behavior Serv. Inc.

v. Bringhurst (In re Bringhurst), 569 B.R. 814, 823 (Bankr. D. Utah 2017) (citing Via Christi

Regional Med. Ctr. v. Englehart (In re Englehart), 229 F.3d 1163, *3 (10th Cir. 2000) (the willful

and malicious injury exception focuses on the debtor's state of mind)); Murphy v. Spencer

(In re Spencer), 541 B.R. 750, 758 (Bankr. D.N.M. 2015).  "When injury was 'neither desired nor

in fact anticipated by the debtor,' it is outside the scope of the statute."  Englehart, 229 F.3d

1163, *3 (quoting Geiger, 523 U.S. at 62).

    To fall within Section 523(a)(6), the conduct must be not only willful but also malicious.

Reperex, Inc. v. May (In re May), 579 B.R. 568, 593 (Bankr. D. Utah 2017) (citing Sierra

Chems., LLC v. Mosley (In re Mosley), 501 B.R. 736, 744 (Bankr. D.N.M. 2013)); Tulsa Spine

Hosp., LLC v. Tucker (In re Tucker), 346 B.R. 844, 854 (Bankr. E.D. Okla. 2006).  An injury is

malicious, within the meaning of dischargeability exception, if it was wrongful and without just

cause or excuse, even in the absence of personal hatred, spite, or ill-will.  Kane v. Stewart

Tilghman Fox & Bianchi Pa (In re Kane), 755 F.3d 1285, 1294 (11th Cir. 2014); In re Levasseur,

737 F.3d 814, 818 (1st Cir. 2013).[7]  "For a debtor's actions to be malicious, they have to be

intentional, wrongful, and done without justification or excuse."  Bertone v. Wormington

(In re Wormington), 555 B.R. 794, 800 (Bankr. W.D. Okla. 2016) (citing Fletcher v. Deerman,

482 B.R. 344, 370 (Bankr. D.N.M. 2012); Tso v. Nevarez, 415 B.R. 540, 544 (Bankr. D.N.M.

2009) ("'Malicious' requires that an intentional act be 'performed without justification or

excuse.'")); AVB Bank v. Costigan (In re Costigan), 2017 WL 6759068 (Bankr. E.D. Okla.

2017).  "Malice may be implied where the preponderance of the evidence establishes that the

debtor committed acts that were 'wrongful and without just cause.'"  Costigan, 2017 WL

6759068, *5 (citing Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012)).

     As explained by the Seventh Circuit Court of Appeals, the Section 523(a)(6) standard can

be confusing, as it has been expressed in numerous fashions with circuit courts content in going

their own way without attempting to reconcile verbal formulations of "willful and malicious."

Jendusa-Nicolai v. Larsen (In re Larsen), 677 F.3d 320, 322-23 (7th Cir. 2012) ("in the course of

our research we have discovered to our surprise that courts are all over the lot in defining this

phrase in section 523(a)(6)").

> But whatever, the semantic confusion, we imagine that all courts
> would agree that a willful and malicious injury, precluding
> discharge in bankruptcy of the debt created by the injury, is one

---

[7]Several circuit courts of appeal have adopted a formulation of "willful and malicious" under Section 523(a)(6) that incorporates a "lack of just cause."  See, e.g., Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012); Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006); Petralia v. Jercich, 238 F.3d 1202, 1208-09 (9th Cir. 2001); Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986).  The Tenth Circuit has not utilized this language, but it has been employed by numerous bankruptcy courts in this Circuit.  Because the Tenth Circuit has adopted a subjective intent standard for purposes of Section 523(a)(6), this Court views the "without just cause" part of other courts' definition as an enquiry to be examined in connection with the specific debtor's subjective intent.

> that the injurer inflicted knowing he had no legal justification and
> either desiring to inflict the injury or knowing it was highly likely
> to result from his act. To allow him to shirk liability by discharging
> his judgment debt in those circumstances would undermine the
> deterrent efficacy of tort law without serving any policy that might
> be thought to inform bankruptcy law.

Larsen, 677 F.3d at 324. The Court agrees with the Seventh Circuit that determination of the

dischargeability of a debt under Section 523(a)(6) is often a balancing act between giving effect

to tort law principles and defining the scope of the Bankruptcy Code's fresh start.

## II.   J BURRIS DID NOT PROVE WILLFUL AND MALICIOUS INJURY UNDER SECTION 523(a)(6).

As set forth in the findings of fact above, the Sanctions Judgment entered by the probate

court stated that B Burris' litigation conduct toward J Burris was wantonly vexatious, oppressive,

in substantial bad faith, and grossly unprofessional and unethical. Further, the Sanctions

Judgment stated that the legal positions taken by B Burris were frivolous and without factual

basis. (See § 67 above) But, as explained by the Court in its Summary Judgment Order, although

the judgment roll from the state court proceedings established the debt owed, the probate court's

conclusions did not address B Burris' state of mind or intent for purposes of Section 523(a)(6),

and thus, trial of that issue was necessary. The Court does not dispute that B Burris' conduct in

the probate litigation was improper and unprofessional. Nor does the Court condone his

misguided actions. Having now conducted a trial on the issue of intent, as explained below, the

Court concludes that J Burris failed his burden of proving a willful and malicious injury by

B Burris. The Sanctions Judgment may be the result of intentional actions, but B Burris'

underlying intent in the probate litigation and pursuing J Burris' deposition was not to injure

J Burris.

34

Section 523(a)(6)'s criterion of willful and malicious injury is often a "heightened standard" compared to various state law requirements under which attorneys fees are awarded, sanctions or treble damages are imposed, or contempt is found.  See Lee v. Daniel (In re Daniel), 568 B.R. 162, 175 (Bankr. D. Mass. 2017) (immoral, unethical, oppressive, or unscrupulous standard for awarding treble damages in fraud and unfair trade practices case not the equivalent of Section 523(a)(6) standard); MidEast Fund for Morocco Ltd. v. Sullivan (In re Sullivan), 2009 WL 3255146 (Bankr. E.D. Tex. 2009) (sanctions against attorney for filing suits that were dismissed for lack of subject matter jurisdiction, lack of personal jurisdiction, or failure to state a claim not necessarily "willful and malicious injury" because Rule 11 compliance uses an objective, not subjective, standard of reasonableness under the circumstances); Vehicle Removal Corp. v. Lopez (In re Lopez), 269 B.R. 607 (Bankr. N.D. Tex. 2001) (attorney's debt for fees and costs assessed under state law for advancing unsupportable claims and failing to exercise due diligence held dischargeable absent credible evidence of intent to injure).  Therefore, many debts arising from an attorney's misconduct and/or legal malpractice are dischargeable because negligently or recklessly inflicted injuries are not within the scope of Section 523(a)(6).  Baker Hughes Oilfield Operations, Inc. v. Christen (In re Christen), 2016 WL 4507445 (Bankr. S.D. Tex. 2016) (citing Kawaauhau, 523 U.S. 57).  See also  Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 466 (6th Cir. 1999); Metcalfe v. Waters (In re Waters), 239 B.R. 893, 905 (Bankr. W.D. Tenn. 1999).  Similarly, debts stemming from violation of professional ethics codes are not *per se* nondischargeable, see Schatzman & Schatzman v. Greason (In re Greason), 2009 WL 701921, *5 (Bankr W.D. N.Y. 2009); Goodstein Realty Boca Raton, LLC v. Gelinas (In re Gelinas), 2007 WL 1184075 (Bankr. S.D. Fla. 2007), even if the debtor's actions violated

state law.  First Weber Group, Inc. v. Horsfall (In re Horsfall),  2011 WL 1628472 (Bankr. W.D. Wisc. 2011).

Notwithstanding the heightened standard of Section 523(a)(6), courts have often found that debts representing attorney fee awards for malicious prosecution and vexatious or bad faith litigation are nondischargeable as willful and malicious injuries.  Steinhardt Managements, Inc. v. Bohn (In re Bohn) 2015 WL 2415412, *7 (Bankr. D. N.J. 2015).   However, courts have also pointed out that not every debt of that type will meet the requirements for willful and malicious injury under Section 523(a)(6).  For example, in O'Melveny & Myers v. Hopkins (In re Hopkins), 201 F.3d 448 (10th Cir. 1999), the Tenth Circuit affirmed a bankruptcy court's decision that sanctions for bad faith litigation entered against debtor were nondischargeable under Section 523(a)(6).  Nevertheless, the Tenth Circuit also stated "[w]e agree with the district court that there may be cases in which a finding of bad faith litigations under California law would not be the equivalent of finding willful and malicious conduct for purposes of § 523(a)(6)."  Hopkins, 201 F.3d 448, *1.

A willful and malicious injury is more easily established when the attorney fees award or sanctions debt relates to certain categories of egregious behavior by the debtor attorney.  For example, if an attorney files an action past the applicable statute of limitations, or one that fails to plausibly state a claim, it may be obvious that the litigation itself is brought only for harassment or other improper purposes.  Ball v. A.O. Smith Corp., 451 F.3d 66, 70 (2d Cir. 2006) (sanctions against debtor-attorney were nondischargeable because RICO and fraud claims were so obviously time-barred that it was unreasonable to bring suit in the first place); Raspanti v. Keaty (In re Keaty), 397 F.3d 264, 273 (5th Cir. 2005) (sanctions against debtor attorney for

36

intentionally pursuing meritless litigation for the purpose of harassment and delay were

nondischargeable); Link v. Mauz (In re Mauz), 532 B.R. 589 (Bankr. M.D. Pa. 2015) (debt of

attorney for bringing ten complaints against creditors without probable or just cause which were

either withdrawn, dismissed, or plaintiffs were found not guilty was nondischargeable); Rose v.

Healy, (In re Healy), 2013 WL 2308472 (Bankr. E.D. Cal. 2013) (fees and costs assessed against

attorney who filed and prosecuted suit to annoy and harass creditor without just cause or excuse

and with knowledge that suit lacked merit were nondischargeable); Hughes v. Arnold, 393 B.R.

712, 718 (E.D. Cal. 2008) (fees imposed on attorney for bringing sexual harassment claim in bad

faith without reasonable basis with the declared objective of "bringing creditor down" were

nondischargeable); Erie Insurance Group v. Chaires (In re Chaires), 249 B.R. 101 (Bankr. D.

Md. 2000) (monetary sanction entered against attorney for pursuing meritless litigation in bad

faith and without justification based on pleadings containing false and fraudulent allegations was

nondischargeable).

  However, this case involves a much more tenuous set of circumstances.  Here, B Burris

did not bring any action or seek any legal redress against J Burris.  Instead, he sought only to

depose J Burris in connection with the objections he filed in the probate litigation as to D Burris'

fitness to serve as personal representative of Decedent's estate.

  According to B Burris, J Burris initially agreed that D Burris was not the best choice to

serve as personal representative because he was "unnecessarily and, by implication, intentionally,

creating conflict in a number of ways."  (See ¶ 100 above)  J Burris apparently changed his tune

after learning that B Burris intended to assist Mother with her claim against Decedent's estate for

child support, knowing that D Burris was resolved to make sure that such claim was not paid.

Therefore, B Burris had a legitimate reason for seeking J Burris' deposition. J Burris' reversal of opinion, and his subsequent intervention in the probate proceedings in opposition to B Burris' objections, seems to have ignited the flames that grew into this lengthy legal conflagration.

The Court understands the gravamen of J Burris' complaint to be that "B Burris advised him to get an attorney and then ran up fees." But as pointed out during trial testimony, B Burris, did not, and could not, force J Burris to hire an attorney. Additionally, as B Burris was not seeking to limit or impact J Burris' personal or property rights in any way, and only sought to depose him relative to D Burris' fitness to serve as personal representative, it seems the primary reason an attorney was necessary was the fact that the brothers could no longer get along in light of one of them being on "Team Mom" and the other being on "Team Dad."

When questioning B Burris at trial, opposing counsel rehashed facts already established on summary judgment and was determined to get B Burris to admit that he had not in fact helped Mother, i.e., that while she reduced her child support claim to judgment, due to litigation expenses, there were no assets left in Decedent's estate to satisfy the judgment.[8] (See ¶¶ 93-94 above) But such fact is quite irrelevant to establishing a willful and malicious injury under Section 523(a)(6) and serves to illustrate that J Burris neglected to focus on and prove the critical requirement remaining for trial – that B Burris intended to injure J Burris.

B Burris' difficult behavior in scheduling and conducting the deposition was unnecessary and improper, and, of course, contributed to the amount of attorney fees J Burris incurred. But, given the family's decades-long history of dysfunction, the Court does not find B Burris'

---

[8]The Court notes that while B Burris' actions may not have resulted in helping Mother financially, it is possible she received other intangible benefits as a consequence of his efforts.

obstinate and scorched-earth litigation practices unexpected.  In fact, such occurrences are

common place in family probate disputes.[9]  To put it mildly, "[p]arties involved in legal disputes

fueled by a family feud frequently are driven not by detached objectivity, but by emotions."

In re Serfass, 325 B.R. 901, 902 (Bankr. M.D. Fla. 2005).  Moreover, "scorched earth litigation

[often occurs] when people have such strong emotional issues that the money becomes

irrelevant."  Paul Fisher, The Power Tools of Estate Conflict Management, 24-Jun. Prob. &

Prop. 42 (2010).  Here, Mother's claim for child support was apparently such an emotional issue

that all parties involved lost sight of the mounting litigation costs in relation to the modest size of

Decedent's estate.

Indeed it would have been surprising if, upon Decedent's death, the members of this

dysfunctional family were all of the sudden capable of acting logically, rationally, and reasonably

in resolving their disputes over his estate and Mother's claim for child support.  But B Burris'

irrational behavior is not proof of intent to injure.  In fact, J Burris himself characterized

B Burris' actions that caused the attorney fees as imposing "expensive and burdensome litigation

[on other family members] so that they would accede to [B Burris'] demands and his preferred

resolution of the conflict that had plagued this family for more than 20 years."  (See ¶ 106 above)

Thus, J Burris' own description of what happened points to a motive and purpose underlying

B Burris' conduct other than intentionally injuring him.  However misplaced or misguided they

---

[9]See, e.g., E. Gary Spitko, The Will As An Implied Unilateral Arbitration Contract,
68 Fla. L. Rev.  49 (2016); Michael S. Orfinger, Mediating Probate Cases to Settlement,
32 Alternatives to High Cost Litig. 41 (2014); Lela P. Love & Stewart E. Sterk, Leaving More
Than Money: Mediation in Estate Planning Documents, 65 Wash. & Lee L. Rev. 539 (2008);
John R. Phillips, Scott K. Martinsen & Matthew L. Dameron, Analyzing the Potential for ADR
in Estate Planning Instruments, 24 Alternatives to High Cost Litig. 1 (2006).

may have been, the Court concludes B Burris' actions were driven by passion and emotion, not malice.  Simply put, the Court believes B Burris desired to vindicate Mother, not injure J Burris.

Establishing the required elements of a Section 523(a)(6) claim is an onerous burden. Many bankruptcy courts have concluded that creditors have failed to meet their burden of proof with respect to debts which most reasonable people would agree ought to be nondischargeable as willful and malicious injuries.  See, e.g., Heinrich v. Bagg (In re Bagg), 589 B.R. 650 (Bankr. E.D. Wis. 2018) (debt reduced to judgment in state court for tortiously interfering with his neighbor's contract to sell property and unlawfully harvesting neighbor's timber was dischargeable); Shirley v. Lopez (In re Lopez), 566 B.R. 255, 260 (Bankr. D. N.M. 2017) (debtor's actions in striking creditor's vehicle with his own vehicle did not result in willful and malicious injury given context of road rage incident where intentional collision was part of debtor's attempt to get away from creditor); Lewis v. Long, 521 B.R. 745 (W.D. Va. 2014), adhered to on reh'g, 550 B.R. 294 (W.D. Va. 2016) (confessed judgment debt for sexual assault and battery of a minor and intentional infliction of emotional distress dischargeable absent proof of debtor's intent to injure); Herman v. White (In re White), 519 B.R. 832, 841 (Bankr. N.D. Okla. 2014) (debtor technically converted property subject to a secured interest but creditor did not meet burden of showing actions were willful and malicious); Sanger v. Busch (In re Busch), 311 B.R. 657, 670 (Bankr. N.D. N.Y. 2004) (creditor failed to show that debtor who permitted hostile environment to exist in work place and made sexual advances acted with requisite intent to harm creditor when she admitted debtor acted with specific intent to advance his own prurient interests at the expense of her right to be free from sexual attack and harassment).

Again, the Court is not making allowances for B Burris' behavior or conduct in the probate litigation and would not have tolerated it in this adversary proceeding.  But, as it has stated in another difficult nondischargeability case, "this Court can only act within the confines of Section 523(a)(6) as interpreted by the U.S. Supreme Court in Geiger, which requires not just an intentional act but an intentional injury.  Geiger, 523 U.S. at 61-61, 118 S.Ct. 974." Hagmaier v. Cooley (In re Cooley), 551 B.R. 498, 506 (Bankr. W.D. Okla. 2016).  Additionally, this Court must apply the Tenth Circuit's subjective standard in determining whether a debtor desired to cause injury.  Another bankruptcy court determined that, if an attorney's professional judgment is clouded by his headstrong and stubborn zealous pursuit of a claim, resulting damages may not rise to the level of willful and malicious injury under Section 523(a)(6).  Bryant v. Rogers (In re Rogers), 239 B.R. 318 (Bankr. E.D. N.C. 1999) (state law Rule 11 sanctions for filing frivolous counterclaim for legal malpractice was dischargeable because attorney believed counterclaim was justified).  Here, B Burris' headstrong, zealous, and stubborn pursuits in the probate litigation were only magnified by the emotionally-charged dysfunctional family feud context.  The Court concludes that B Burris' professional judgment was more than obscured by his fervor to vindicate Mother and "see justice done in this family."  However, J Burris, who had the burden in this matter, simply did not prove that B Burris intentionally injured him in B Burris' ill-advised and poorly-executed pursuit of his self-imposed duty to seek family justice.

## CONCLUSION

The Sanctions Judgment against B Burris does not represent a debt for willful and malicious injury to J Burris under Section 523(a)(6).  Therefore, it is dischargeable.

IT IS SO ORDERED.                         # # #

41